Thank you, Judge Sung, and may it please the Court, Neal Katsuyama. We're waiting for your clock to be reset. There you go. But go ahead and let me know. Are you planning to reserve time for rebuttal? Yeah, I plan to reserve five minutes for rebuttal. Okay. And then your opposing counsel are not quite ready yet. Oh. So you can just hang on. Thank you, Judge Sung, and may it please the Court. The District Court here imposed an extraordinary injunction in joining the State's legislation on carrying guns in bars, restaurants, beaches, parks, and banks, as well as from enforcing its private property default rule. The public interest and balance of equities strongly favors the State, and the injunction should be vacated. The District Court here essentially demanded historical twins despite Bruin's statement to the contrary, and even when Hawaii provided those twins, the Court dismissed them due to arbitrary time period, geographical, and population threshold requirements. The simplest way to see this is to pick on something Judge Graber just asked a moment ago and look to a key example the Supreme Court used as a historical analog, a settled, sensitive place, legislative assemblies. They were a whopping two historical laws in total from just one of the 13 colonies. That was enough, the Court found, because there were no sources at the time saying those restrictions were unconstitutional. So, too, here with each of our analogs, and we have a lot more than two of them, a similar problem infected the District Court's analysis of the private property default rule, which does not ban firearms on private property. It simply elicits the preferences of the property owner. Finally, it's worth a pause to just think about the extraordinary arguments voiced by the plaintiffs. In the last case, they just told you that schools are not sensitive places. That, to put it mildly, is absurd. That was one of the examples the Supreme Court offered. This is a radical theory. As Justice Scalia might say, this wolf comes as a wolf. We think the District Court got things wrong because it adopted basically what this Court in Perez-Garcia called a divide-and-conquer approach. The amicus brief by Mr. Charles really explains how the District Court was just nitpicking example after example and missing the forest for the trees, imposing all sorts of restrictions on what counts as a good enough example. We don't think that has fidelity to the historical record, as the schools example or the legislative assembly one shows. I'd like to ask you about the private property issue, which I find sort of different from the other types of restrictions in both of the statutes that we're considering. And it does appear that at least one of the statutes from the 1700s was enacted for the purpose of preventing poaching. Does it matter what the purpose of the statute was? If it wasn't, if so, how does that historical example assist you? Judge Graber, we have a lot to say about this, both with respect to the preliminary injunction standard you asked in the last case, but also with respect to this specific law and these specific examples. We do think purpose is relevant, but as the testimony shows from Professor Hertog, there are often statutes with multiple different purposes. And here we have dead ringer statutes that are not limited to poaching or hunting. Let me read to you the 1763 New York statute, Judge Graber. And by the way, we think the Second Circuit got everything in Antonique right, except for the private property default rule. And we think there are important factual distinctions for why you won't have to prompt a circuit split, and I'll explain all of that in a moment. But just to answer your question about the purpose, the 1763 law makes it unlawful to, quote, carry, shoot, or discharge any musket or other firearm whatsoever without license in writing first-hand and obtained from that purpose from such owner or proprietor. Now, the law also says on its face it's intended to address, quote, the great danger to the lives of His Majesty's subjects imposed by guns on other property, including grievous injury to the proprietors. So this is a law about exactly the same thing that the private property default rule is about. It's about protecting property owners and vindicating their property rights. 1771 New Jersey, Judge Graber, makes it a violation to, quote, carry any gun on any lands, not his own, and for which the owner pays taxes or in his lawful possession unless he hath license or permission in writing from the owner. That is markedly not limited to hunting or poaching. It's any lands. There's testimony from Professor Hartog which explains that this law would apply, for example, to the blacksmith shops or things like that. Now, the meta point you were asking before about preliminary injunctions and not prompting circuit splits, we don't think it will prompt a circuit split, but we urge you very much, even if you thought it did,  This court in Hecox v. Little said that, quote, preliminary injunction is an extraordinary and drastic remedy that should not be granted unless the movement, by a clear showing, carries the burden of persuasion. And that's particularly so here when we're talking about an injunction against a public safety law enacted after lots of debate to try and take account of Bruin and to take it seriously. Judge Graber, you yourself, in the Duncan v. Bonta case back in just last year on Bonk, you said, quote, The one that got reversed, right? But not, I think, on this point. You said the public has a compelling interest in promoting public safety, and while the dissent in that case on Bonk by Judge Bamate said, oh, this is not a good prediction of what the law is and the like, you said, despite the fact that there was a district court that disagreed with what you said in there, you said the job is to balance the equities, make sure and do a proper likelihood of success calculation. And I think that's particularly so when you're dealing about something like this, which is about public safety. I don't think this court has ever said, oh, you have more latitude to avoid a circuit split in the preliminary injunction context. I think that would be brand-new law. Now, let me explain to you why I don't think this matters, because I don't think the Second Circuit is going to, if you ruled our way, that you would prompt a circuit split. There are three reasons. The first is that page 385 of Antonek, the Second Circuit relied on a concession by the state in that case that the historical laws were about hunting. We are, as I just told you, markedly pushing back on that. We have dead ringers that say that's not what's at issue. So we just don't think it was briefed upright or conceded, that was a conceded issue before the Second Circuit. It is not conceded here. Second, we have all sorts of testimony that explains that, like Professor Hartog, and says this is not limited to, that these statutes were not limited to hunting or poaching and the like. And then third, I think most importantly, Hawaii has a very, very different tradition about carrying than does New York. In New York, there were 200,000 concealed carry permits that were issued in that regime. Hawaii, since 1852, has almost entirely prevented public carrying of all firearms. So why does that matter under Bruin? Because I think, as our brief and the property law professor's brief explains, what this default rule is trying to do is elicit the preferences of property owners. For somewhere like New York, property owners— Why wouldn't you just require property owners then to post their preference? You could do it that way. And, you know, I think Hawaii has taken a more limited approach to say you can do it by posting, you can do it by verbal signage, you can do it by verbal permission. But as I said to you, New Jersey and New York actually did require essentially writing. We don't think that you have to go that far. I have some difficulty, I must say, just obviously speaking for myself, with the idea that the result of a Bruin analysis will be different from state to state and an identical statute because, you know, that's like saying, well, some states have robust First Amendment expression, like Oregon, I guess, would be a good example, and other states' people are much more shy and they don't come forward. But the First Amendment applies the same way. So I really have—I don't understand why we could come to a different result because of the essentially local preferences. So, Judge Graber, I'd say two things. Number one, our primary position to you is neither statute violates the Second Amendment, that they flunk Bruin Step 1 because there is no right to carry on private property, and that means that changing the presumption about consent isn't violating the Second Amendment because that right literally doesn't exist. So this, Act 52, is not a ban. It's because when owners consent, after all, people can carry firearms. Our second point to you in terms of this distinction is that, like take the district court's analysis or take the Second Circuit. What they were essentially doing was saying there is implied consent when the property owner is silent to carry a firearm, and that might work for New York in which there's a long—owners had to think about this stuff. In Hawaii, it doesn't. And so it's hard to infer that implied consent, which is what the Second Circuit thought and what the district court here thought, given the different tradition. And I don't think that's different than other parts of the Constitution. Take, for example, community standards in the obscenity cases, Miller v. California. You are looking to community standards to try and understand what is obscene here. Well, that hasn't been our most successful standard. But it is, of course, absolutely the standard. On the consent issue, if I'm remembering correctly, there are some differences between the California and the Hawaii statutes in terms of— if I'm remembering correctly, California requires a particular sign and there's no other way to determine consent. And would there be a meaningful distinction for purposes of our analysis because you could essentially get consent at the moment? Right. Our statute is, I think, a bit more protective because it allows different ways of getting consent. Theirs is a little more specific. We think both are constitutional, but we do think ours is better. Ours also has a mens rea provision in it, so it requires some heightened mens rea in order to violate the statute. And so those are some safeguards against it. But our fundamental point to you is we do think that the private property default rule is just a way to try and elicit preferences. To be sure, other courts have disagreed with it. We don't think it's been briefed up to other courts with the record and explanation that you have here. Here you do have dead ringers in 1763, 1771, 1865 Louisiana, and the other statutes in our brief. Can I ask you a question on the preliminary injunction point? What else is there to be litigated in this case? We think there isn't anything. We think that, you know, at the end of the day, these are not Second Amendment violations. The Second Circuit, as I say, we think got all of these things right except for the private property default rule. I think a couple of other points to make. I think my friend has made a big deal in his brief about parking lots and the like. Our brief explains why shared parking lots aren't encompassed within the statute. And also there's an affirmative defense with respect to parking lots so that it doesn't include if you leave the gun in the car in a secured place. And so this isn't some robust ban or something like that. Now, Judge Graber, you had asked in the earlier argument to my friends from California, you said what wouldn't be included as a sensitive place. For us, we have the following answer. First, we think that sensitive places are defined by the people in those places or the activities that take place therein. Are there especially vulnerable populations like children or things like that? Is there expressive constitutional activity that's undertaken? For example, parks and beaches. Our brief explains 12 different instances where there's speech on the beach in Hawaii, on the Honolulu Beach, and things like that. So that's part of it. Second, there is a rock-solid limit built into Bruin itself. It said you can't, for example, declare the entire island of Manhattan a sensitive place. It's got to be far more limited. Here, Hawaii's Act 52 is far more surgical. It's far more limited than that. We believe that if you had to be pushed to try and fully flesh out what the standard is, and we don't think the Supreme Court's quite given us all this guidance, but just we think the best way of thinking about it is that the government cannot, for example, declare all roads and sidewalks sensitive places. It can't declare all commercial establishments sensitive places, places like Best Buy or Gap or things like that. Rather, you need some sort of plus factor in order for something to be constitutional. A vulnerable population, like a toy store. Crowding, like concerts in the example from the last argument. The exercise of other constitutional rights, like theaters or something like that. Something that is central to the economic life of a particular place, like banks and our banks provision. Or places where guns are especially dangerous, like bars serving alcohol and things like that. We think that's a limited way. That's what the Supreme Court had in mind in Bruin. It's faithful to all the historical examples and analogs that we offer with respect to any one of these. The other thing I just want to say, and it's a point of difference a little bit with California, is that our brief does explain that with respect to public lands, that's parks and beaches, the government has broad latitude because it acts as a proprietor. The Enquist case says, in that circumstance, there is extra latitude. The government has to balance its abilities against rights, but it does have an additional power there. This court's decision in Nordyke also recognized that as well. With respect to parks and beaches, we think that's something that there's a unique power that does apply to those specific areas. I'm just not sure if this clock reflects the... That includes your rebuttal time. If there are no further questions, I'd like to reserve. Thank you. Yes, ma'am. Good morning, Your Honor, and may it please the Court. My name is Alan Beck for the Plaintiff Appellees. With me at the council table is my co-counsel, Kevin O'Grady, and my client, Jason Wolford, and the associational director, Todd Uketake, is there. I have three points I'd like to make. First, Bruin holds there's a general right to carry that's subject to certain exceptions. Here the record demonstrates that 96.4% of the county of Maui is... Of the publicly accessible land on the county of Maui is restricted from carrying. We know from Bruin that the island of Manhattan is not a sensitive place. It cannot be a sensitive place. It can't be that the county of Maui, which is far larger, can be deemed a sensitive place. Doesn't it depend, though, on how the definition is? I mean, this is a made-up example, but suppose there were an island that was 100% occupied by a school, and the definition in the statute is no carry on a school property. So it may equate to an island, but that isn't why the law applies. So if that is true, what difference does it make? What is the percentage of one of the islands that is covered by these specific provisions? Well, it's important because this is where my clients live, and they have to live... I understand it's important to them. I'm asking you a theoretical question. In other words, if I'm using school, and for the purpose of my question, I'd like you to assume that it's permissible to prohibit the carry or at least concealed carry on school grounds. So if a giant school that takes up a whole island exists, but the law doesn't say you can't carry on X, Y, Z island, but rather it says you can't carry on school property, I don't understand why that wouldn't be okay, even though it happens to be coterminous with the geographic location. If an entire island were a polling place, then I see your point, Your Honor. Okay, so why does it matter to us what the percentage is of one of the Hawaiian Islands? Well, because essentially what's occurring here is that for the population of Maui, and Maui is a general residential, I mean not residential, but people live there. The vast majority of it has become a no-carry area for them, and their right to self-fence is being essentially curbed down to the streets and the sidewalks. And it does matter how much, because this isn't a hypothetical, I mean this is... But the law doesn't cover streets and sidewalks per se. No, I mean essentially everywhere but streets. Oh, I see what you're saying. My apologies. I try not to say anymore. So the ultimate point I'm trying to make here is that this restriction makes carry the exception, not the rule. And we know that's turning brood on its head. Well, Hawaii consists of more than one island, so why would we look only at Maui rather than at the entire state? Because this is both a facial and as-applied challenge, Your Honor. Therefore, the situation in Maui is vital to determining my client's as-applied challenge. The record shows that there is no long-standing history in traditioning limiting the general right to carry in the locations challenged here, which are all locations that existed at 1791. All Bruin teaches is that a sensitive place is a discreet government location where vital judicial or legislative business is occurring when the location is open to the public. That's what we know from the three locations that were listed in Bruin. Now, both my friend on the other side and the last case have all been asked, how can this case be squared with Antioch? Now, I think it goes without any surprise that, of course, we want this Court to adopt as the default rule on that the Second Circuit's position there. Now, it may be, we think on many points, the Second Circuit's decision in Antioch was wrongfully decided. However, all the challenges at issue in this case can be reconciled with the Second Circuit's opinion. The reason for this is, for example, in Antioch, the Second Circuit strongly said that this Court, the Second Circuit, was not ruling on the issue of whether it was permissible to ban carry in rural parks. Here, the entirety of the County of Maui is a rural area, and many of the locations where my clients have expressly alleged intent to go to are expressly rural. For example, Poli Poli Park is a location where my client, Adam Kapritsky, has said that he wishes to go to. Hunting with a firearm is allowed at Poli Poli Park, and he goes there on a regular basis. The fact that carrying for self-defense is prohibited, and while you can carry a firearm for hunting, is in no shape, way, or form steeped in any type of historical tradition. It's also nonsensical. My other clients, Jason Wolford, who's in attendance, frequently goes to Rice Park. Rice Park is outside of town. It has a regular, you know, it's several acres large. The park itself is, you know, four acres large, and it's out in a rural part of what's a rural island in the Pacific. This challenge is distinguishable for Antioch on the park issue because of the rural nature of both the beaches and the parks on the county of Maui. As to the issue of banks, the only historical justification that my friend on the other side has put forth for the bank ban is a restriction on fairs and marketplaces. Now, we have demonstrated in the briefing that these are more like Northampton-style statutes where you couldn't carry it in. They essentially were disturbing the peace laws, but even taking the state's arguments at face value, they can't be used to justify the ban on banks pursuant to the Second Circuit's decision in Antioch. The reason for that is in Antioch, the Second Circuit expressly found that the cited laws on fairs and marketplaces, the exact same ones that are being used here, demonstrate a historical tradition of prohibiting carry in public gatherings. That's just simply not relevantly similar or comparable, or whatever word you'd like to use, to a ban in a single private business like a bank. Similarly, our challenge to restaurants that serve alcohol. In Antioch, the court found that there is a historical tradition of keeping guns away from areas where there's a lot of people that are drunk. That's not the case in most of the locations here. The government has not demonstrated that, has not produced any record evidence at all that these locations actually have people that are drinking. For example, we have a California pizza kitchen, or a round table pizza, California pizza kitchens in the record. People typically do not go, the average person that goes to a California pizza kitchen for a slice of pizza, maybe has a beer, doesn't drink to excess. This isn't a location where people typically go and get particularly drunk. If we take Antioch, assuming Antioch persuaded this court, we can see, based upon that, that all the restaurants at issue here, there's just no evidence that there's people that actually were drunk there. Therefore, Antioch actually supports the opposite result for the restaurant ban because there's no historical tradition of, the state's not produced a historical tradition of prohibiting people at these types of locations where perhaps alcohol is legal to serve, or beer and wine, but it's not a place where people typically get drunk, or at least the state has not produced any evidence of such. As for the parking lot issue, I'd just like to discuss a little bit of our as-applied challenge with my client, Mr. Papritsky. Now, there is no— Counsel, is there a distinction to be drawn between a large, generic parking lot, say, at a mall, versus three parking places next to a polling place where it's really an adjunct to something where carry can be regulated? From the constitutional sense or statutory? Yes, yes. I wasn't sure if we talked about the statutory. From the constitutional sense, yeah, there may be. For example, here, our parking lot ban challenge is only to a fairly narrow group of parking lots. It sounded to me, and maybe opposing counsel can clarify this, but I understood from his opening remarks and from the briefing that the sort of large, generic parking lot is not covered by this statute. I may be wrong about that. That is a position that they've taken post—in the middle of litigation. Well, regardless of when they took it, if it's the position of the state that it does not apply except to the immediately adjacent parking of an otherwise regulatable place, then it sounds like maybe you don't have a difference of view with respect to the constitutionality of that location.  Again, Rice Park has a lifeguard station at it. It's actually a lifeguard building. The statute says that you have a right that you can't carry at a beach and you can't carry in the parking lot of a government building. There's some other aspects to it, but that's what's relevant here. Because there's a lifeguard building at Rice Park that has electricity, running water, a whole nine yards, it qualifies as a building under Hawaii law. So in addition to the issue of it being a beach, that parking lot's also prohibited because it's a government building. So every single one of my clients go there, and it's not a parking lot that's co-shared with something else, as Your Honor was discussing. So, I mean, that's the issue that's certainly a right for adjudication, Your Honor. Can you turn to the consent issue in the private property owner? So assume if a private property owner actually says, I don't give my consent for you to carry your weapon on my private property, there's no dispute that they can enforce their will on their own private property. Is that right? Yes. So the only issue is that essentially the state is requiring permit holders to determine whether the private property owner consents. That's a large part of it. It's also an issue with the private—one of my clients actually owns a business, and there's an issue with him having to put up a sign as well. So that's a separate aspect. That issue wasn't up on appeal, but I'm just saying that that is an issue in litigation, and there's other aspects as to why this ban burdens people's constitutional rights, Your Honor. Are there any further questions? Not from me. Before I conclude, let me reiterate that Broon— all we know from the polling places and courthouses language from Broon is that places that serve a vital legislative or judicial government purpose can be banned, can be deemed a sensitive place. Every other place, there actually has to be an affirmative task on the part of the government to actually produce a historical record that's directly on point, and here, the government simply has failed to do so. I will cede the rest of my time to the Court. Thank you very much, Your Honors. Thank you. Thank you. I have four points. First, on this 96.4% statistic, that is a totally made-up statistic by a plaintiff. With a handmade map, there is zero explanation of the methodology. As Judge Graber said, the method matters. We would have certainly briefed this if we had an opportunity to do so. They attached it to their TRO reply in the district court. Can you address the rural versus urban park distinction? Sure. So the district court didn't even use that rationale, and, of course, this is a facial challenge, and if there are urban parks that are okay, then it would be enough to sustain the operation of the statute. But with respect to it specifically, we just think it's dead wrong. Our brief and the Everytown brief have many examples of rural parks that banned firearms from the moment that rural parks became a thing, Yellowstone in 1897, Mackinac Island in 1882, and the like. So we don't think that that distinction matters one bit. Back to the 96.4% thing, I just want to be clear about the methodology. That map is not a map about the percentage of the entire island of Maui. It's about places open to the public. The map is found at 2 ER 315, and it shows that this is just less than one-third of all the land. It's nothing like making all the island of Manhattan a sensitive place or anything like that. And the counting is so wrong. It has the wrong denominator. It treats all private property on the entire island as banning firearms when we know the default rule permits the carrying of firearms so long as the owners consent. It also overstates the impact of Act 52. For example, it treats forest reserves as included as part of what Act 52 did, but forest reserves have always had, well before the Act, a prohibition on firearms. It also doesn't take account of the people who can carry firearms after Act 52, for example, if they have hunting licenses and the like. And as Judge Graber was saying, Maui is just one island. The proper way of thinking about it is statewide. So we just don't think that map should concern you one bit. With respect to the private property default rule, I understand the court has many questions about that. We think our fundamental position to you is that this rule is lawful both in New York and in Hawaii. It's an extraordinary thing for this court to enjoin such a public safety statute. The Chief Justice's opinion in Maryland v. King I think is instructive on this point. Many states have now flipped the default rule when it comes to firearms. The D.C. State's brief at page 20 goes through example after example, and we think with all due respect to the Second Circuit, which got everything else right, on this one it got it wrong, and that's because of the historical record that they had before them, which is very different than the historical record that you do. And I don't think that there's any way, given those dead ringers like 1763 and 1771, for this court to strike down the private property default rule without doing grave violence to the post-Bruin jurisprudence. You'd essentially at that point be saying you need more dead ringers or something like that, and that's just not what the law is. With respect to parking lots, Judge Graber, absolutely we don't think it applies to large shared parking lots or small shared parking lots. That's always been the position. It was the position taken before the preliminary injunction was even issued. The Attorney General said so. And in Young v. Hawaii, my friend on the other side tried this argument about the AG's interpretation not being instructive, but the court found it was highly instructive. With respect to restaurants, there are many historical examples of the government banning alcohol at Balls and Fandangos. The government didn't prove that everyone was drunk at those things. It had the power to enact a prophylactic law there, and the prophylactic law here follows squarely within that. With respect to banks, there is no standing because they've never alleged a bank, and the bank would permit firearms, but they are former government instrumentalities in which the government has more latitude. And, of course, they're crucial for the economic functioning of society. And for that reason, we don't think that it falls squarely within the historical tradition. And finally, I think the most important point for each of these provisions, we've given you historical analogs. One or two is enough, as the Legislative Assembly shows. But the most important thing is that there's no tradition on the other side. Remember in Bruin, when the court looked to sunset, when the court looked to good cause licensing restrictions, it was able to find very few examples in history of licensing regimes. And the regimes that existed were immediately challenged and found violations of the Constitution. Here you've got the reverse. In each of these instances, we're giving you example after example, historical analog after historical analog, and there is no contrary tradition. Nobody wrote an op-ed. Nobody brought a court case. Nothing that said these things were impermissible. To the contrary, State v. Shelby, for example, Missouri in 1886, the Supreme Court, said that you could ban firearms from any public assembly, and notably the Supreme Court in Bruin in footnote 30 cited the Shelby case with approval. We think that's the right way to think about this, as long as you have some analogs that are faithful to the historical tradition, that's enough, and certainly not this divide-and-conquer approach that the district court adopted here. Thank you, counsel, for your helpful arguments. This matter is submitted. I believe we are adjourned for today.
judges: SCHROEDER, GRABER, SUNG